IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action Number |
| | ) | 13-00003-01-CR-W-HFS |
| Kamel Elburki, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the MOTION TO SUPPRESS EVIDENCE (Doc. #27) filed on February 15, 2013, by defendant Kamel Elburki ("Elburki"). On May 2, 2013, the undersigned held an evidentiary hearing on Elburki's motion. Elburki was present and represented by his counsel, James L. Spies. The government was represented by Special Assistant United States Attorney Sydney N. Sanders. At the evidentiary hearing, Elburki testified along with three other witnesses: Sergeant Daniel Graves and Detective Michael Wells, both with the Kansas City, Missouri Police Department, and Detective Loran Freeman with the Independence, Missouri Police Department. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Gov't. #1 | Miranda waiver |
| Gov't. #2 | 11/27/2012 audio recording |
| Gov't. #3 | 12/17/2012 video recording [Disc 1] |
| Gov't. #4 | 12/17/2012 video recording [Disc 2] |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

# PROPOSED FINDINGS OF FACT[1]

1. On November 27, 2012, Elburki's brother arranged for Elburki to come to the Shoal Creek Station of the Kansas City, Missouri Police Department and speak with Sergeant Daniel Graves and discuss his knowledge regarding some stolen property. Tr. at 7-8, 22-23, 25, 45.

2. Prior to the interview, Sgt. Graves was aware that Elburki was a possible suspect in a felon-in-possession case. Tr. at 25, 35.

3. Upon arriving at the station and waiting in the station lobby for a time, Elburki was taken to an interview room and told that he was not under arrest. Tr. at 10-11, 26, 46, 90.

4. In the interview room with Elburki were Sgt. Graves and Detective Michael Wells. Tr. at 29-30.

5. Elburki was given a *Miranda* waiver form to read before being asked any questions. Tr. at 12-13, 31-33, 47.

6. Elburki read the form out loud, indicated that he understood his rights, but declined to sign the form. Tr. at 13, 47-48.

7. Elburki stated that "he just didn't want his name on any kind of discovery." Tr. at 13-14, 39, 48-49.

8. Sgt. Graves stated that Elburki did not have to sign the waiver, but he needed to understand his rights. Tr. at 14, 39.

9. Elburki acknowledged that he understood his rights. Tr. at 14, 38, 48, 57.

10. Elburki appeared to Sgt. Graves and Det. Wells to be nervous, but cooperative. Tr. at 12-13, 15-16, 47.

11. Elburki did not demonstrate any signs of intoxication or impairment from drugs or alcohol. Tr. at 15-16, 49-50.

---

[1] In making these findings, the Court has been required to make some credibility determinations, particularly as they pertain to the officers' recitation of the facts surrounding the interviews and Elburki's testimony regarding the interviews. In making such determinations, the Court considered (1) the demeanor of the witnesses on the stand, (2) the interest the witnesses had in the outcome of the motion, and (3) the opportunity of the witnesses to hear, observe, and recall what was said or done. In the end, the Court concludes that, in general, where there were conflicts, the officers were more credible witnesses.

12. During his interview, Elburki told the officers that he had a reputation for being "retarded," which the officers took to mean as a colloquial way of saying that he was known to do "stupid" things at times. Tr. at 16-17, 50-51.

13. Sgt. Graves and Det. Wells did not believe that Elburki was referring to diminished mental capacity and Elburki did not appear to have any diminished mental capacity in responding to questions and offering explanations and descriptions during his interview with the officers. Tr. at 17-18, 51.

14. The interview lasted just over an hour. Tr. at 18, 52.

15. At no time during the interview did Elburki invoke his *Miranda* right to remain silent or right to have an attorney present. Tr. at 19, 52.

16. Later that day, Elburki voluntarily met Sgt. Graves at a QuikTrip, where Elburki returned some stolen property in his possession. Tr. at 18-19.

17. On December 14, 2012, Elburki was arrested by several law enforcement officers including Detective Loran Freeman with the Independence, Missouri Police Department. Tr. at 58-60.

18. Following his arrest, Elburki was transported to the Independence Station by Det. Freeman. Tr. at 60.

19. During the transport, Det. Freeman asked Elburki if he would be willing to talk with officers when he arrived at the station. Tr. at 61.

20. Elburki indicated that he was willing to talk. Tr. at 61.

21. Elburki's interview with Det. Freeman began at approximately 4:00 p.m. Tr. at 62-63.

22. Det. Freeman presented Elburki with a document setting forth the *Miranda* rights. Tr. at 64-65.

23. Elburki signed the waiver form after acknowledging he understood his rights. Tr. at 65, 68.

24. In obtaining Elburki's waiver, Det. Freeman noted on the form that Elburki had completed schooling only through the 9th grade but had subsequently obtained his GED. Tr. at 66-67.

25. During the interview, Elburki appeared to Det. Freeman to be polite, cooperative, respectful, but somewhat downcast over his circumstances. Tr. at 68-69.

26. During the interview, Elburki never indicated that he wanted the interview to stop or that he did not understand his rights or that he wanted an attorney. Tr. at 69, 72.

27. Det. Freeman was aware before the interview that Elburki was known to use methamphetamines. Tr. at 71, 76.

28. On the day of the interview, Det. Freeman did not note anything about Elburki's appearance or demeanor to suggest that Elburki was under the influence of or was impaired by drugs or alcohol during the questioning. Tr. at 70-72, 76-77.

29. The interview with Elburki lasted a couple of hours. Tr. at 72.

## PROPOSED CONCLUSIONS OF LAW

In his motion to dismiss, Elburki challenges the admissibility of incriminating statements he made during his two interviews with law enforcement officers. To that end, the Fifth Amendment commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. With regard to the Fifth Amendment, the Supreme Court has found:

> The essence of this basic constitutional principle is the requirement that the [government] which proposes to convict and punish an individual produce the evidence against him by the independent labors of its officers, not by the simple, cruel expedient of forcing it from his own lips.

*Estelle v. Smith*, 451 U.S. 454, 462, 101 S.Ct. 1866, 1872 (1981). However, as the Supreme Court has also made clear on numerous occasions, the right against self-incrimination does not prohibit any and all statements made by suspects to law enforcement officers from being admissible in a criminal proceeding. For example:

> [The Fifth Amendment] does not preclude a witness from testifying voluntarily in matters which may incriminate him, . . . for those competent and freewilled to do so may give evidence against the whole world, themselves included. . . . Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.

4

*U.S. v. Washington*, 431 U.S. 181, 186-87, 97 S.Ct. 1814, 1818 (1977). The touchstone of such Fifth Amendment analysis is voluntariness. *Dickerson v. U.S.*, 530 U.S. 428, 434, 120 S.Ct. 2326, 2331 (2000) ("We . . . continue to exclude confessions that were obtained involuntarily.").

With regard to statements made by a suspect during custodial interrogation by law enforcement, the Supreme Court, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), enunciated a special test for ascertaining voluntariness. The reason for such special treatment stems from the Supreme Court's recognition that custodial interrogations are inherently coercive. *Dickerson*, 530 U.S. at 435, 120 S.Ct. at 2331; *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 2630 (1984). Indeed, in *Miranda*, the Supreme Court observed that custodial interrogations, by their very nature, generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624. Consequently,

> To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused.

*Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 1140 (1986). These procedures, now almost universally familiar, include fully apprising a suspect of the prosecution's intention to use his statements to secure a conviction and informing him of his rights to remain silent and to have counsel present if he so desires. *Miranda*, 384 U.S. at 468-70, 86 S.Ct. at 1624-26.

Despite the inherently coercive nature of custodial interrogations, it is well settled that a criminal suspect may waive the rights contained in the *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1628. However, "[a] waiver of *Miranda* rights is invalid if, in the totality of the circumstances, the accused's will was overborne." *United States v. Holloway*, 128 F.3d 1254 (8th Cir.1997) (*citing*

*United States v. Makes Room*, 49 F.3d 410, 414 (8th Cir.1995)); *see also U.S. v. Caldwell*, 954 F.2d 496, 505 (8th Cir.1992) (waiver of *Miranda* rights is determined under totality of the circumstances and in light of the entire course of police conduct).

In *United States v. Boyd*, 180 F.3d 967 (8th Cir.1999), the Eighth Circuit explained how to determine whether a waiver of Miranda rights is valid:

> The determination of whether an accused has knowingly and voluntarily waived his *Miranda* rights depends on all the facts of each particular case. The circumstances include the background, experience, and conduct of the accused. The government has the burden of proving that the defendant voluntarily and knowingly waived his rights.

*Id*. at 977 (*internal citations omitted*); *see also U.S. v. Barahona*, 990 F.2d 412, 418 (8th Cir.1993) (government bears burden of proving by preponderance of evidence that defendant knowingly, voluntarily, and intelligently waived his rights).

Thus, an inquiry into whether a suspect's *Miranda* rights have been waived "has two distinct dimensions." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. The Court has explained:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id*. at 421, 106 S.Ct. at 1141. The *Moran* court further noted that "[o]nly if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id*. (*quoting Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2571 (1979)). These principles subsequently have been summarized by lower courts. For instance in *Holman v. Kemna*, 212 F.3d 413 (8th Cir. 2000), the Eighth Circuit found:

6

> A waiver is voluntary if it is the product of a free and deliberate choice rather than intimidation, coercion, or deception. A waiver is knowing and intelligent if it has been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id*. at 420.

In reviewing the totality of the circumstances surrounding the two interviews[2] conducted with Elburki, the Court concludes that Elburki's waiver for each of the interviews was knowing, intelligent and voluntary. The atmosphere surrounding the interviews was not coercive. Elburki was not threatened nor were promises made to Elburki to induce his statements. As shown in the CD of the first interview and the DVD of the second interview, Elburki is reasonably intelligent, appeared to understand what was happening, and did not appear to be intoxicated, drugged, or otherwise impaired. Moreover, Elburki acknowledged his *Miranda* rights prior to each interview and executed a written waiver of his *Miranda* rights before speaking with officers in the second interview. With this record, the Court finds that Elburki's waiver of his *Miranda* rights was knowing and voluntary.

In making this finding, the Court has specifically considered and evaluated Elburki's claims that:

(1)  he refused to sign the waiver form in the first interview,

(2)  he told the officers in the first interview that he had a reputation for being "retarded," and

(3)  he was under the influence of alcohol and drugs during the two interviews.

---

[2]  The Government asserts that the analysis for *Miranda* is unnecessary for the first interview inasmuch as Elburki's appearance at the police station was voluntary and he was not in "custody." The Court makes no finding on the custody argument, but simply assumes that the first interview was custodial interrogation for purposes of this ruling.

The evidence presented on these issues does not dissuade the Court from its belief that Elburki knowingly and voluntarily chose to speak with law enforcement officers with full understanding of his constitutional rights.

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** both the MOTION TO SUPPRESS (Doc. #27) filed February 15, 2013.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

                                                 */s/ John T. Maughmer*
                                                 **John T. Maughmer**
                                         **United States Magistrate Judge**